## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES BRETT GIFFORD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.  1:14-CV-1179-SLB-JEO** |
| | ) | |
| **WARDEN JOHN RATHMAN; THE FEDERAL BUREAU OF PRISONS; THE UTILIZATION REVIEW COMMITTEE; GEORGE SMITH, M.D., Physician; NORTHEAST ALABAMA REGIONAL MEDICAL CENTER; R. HARDIN, Counselor; BOTT, Correctional Officer; S. PACO, MLP; M. MOURTADA, MLP; L. MARASIGAN, MLP; WILLIAMS, Correctional Officer; MRS. M. TIPPLE, RN; DR. M. HOLBROOK, M.D.; MS. GARDNER, Correctional Officer; UNITED STATES OF AMERICA,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on defendants' Special Reports, (docs. 24, 25, 52, 60),[1] which the court has notified the parties it will construe as Motions for Summary Judgment, (doc. 61).  Plaintiff, James Brett Gifford, was a prisoner in the custody of the United States Bureau of Prisons [BOP] and was housed at the Federal Correctional

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.  Citations to page numbers in such court documents refer to the page numbers assigned by the court's electronic filing system unless otherwise indicated.

Institution at Talladega, Alabama, [FCI Talladega] at all times relevant to his claims. In his Amended Complaint, Gifford alleges claims against defendants pursuant to the Alabama Medical Liability Act [AMLA] and the Federal Tort Claims Act [FTCA], and pursuant to *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971), for allegedly inadequate medical treatment of his back injury and for harassment. (*See generally* doc. 11.) Upon consideration of the record, the submissions of the parties, the Special Reports, and the relevant law, the court is of the opinion that Summary Judgment is due to be granted in favor of defendants.

## I. SUMMARY JUDGMENT STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)).

Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II. <u>STATEMENT OF FACTS</u>

According to Rule 56(e), "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion [and] (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2)-(3). Despite being warned of the consequences of failing to respond to defendants' Special Reports, which the court is treating as Motions for Summary Judgment, Gifford failed to address defendants' assertions of fact. Therefore, the court deems the following facts, which are supported by record evidence, to be undisputed.

On Saturday, June 23, 2012, Gifford reported to the Health Services Unit at FCI-Talladega, complaining that he had "hurt [his] back playing ball." (Doc. 54-1 at 79; 60-28 ¶ 4.) An examination revealed tenderness. (Doc. 54-1 at 79.) The nurse on duty gave Gifford 800 mg of Ibuprofen to be taken three times a day for seven days and told him to use ice compresses several times a day, and she told him to "make sick call on [M]onday if no improvement." (*Id.*; doc. 60-3 ¶ 3; doc. 60-28 ¶ 4.)

Gifford testified that he slept on the floor that night because he could not climb into his upper bunk. (Doc. 1-1 ¶ 8.) Defendants Michaela Tipple, RN, and Dennis Bott, Correctional Officer, responded to his cell the following morning when he could not get up. (*Id.* ¶ 10.) Gifford alleged that, when he could not get up, "Bott got down close to [his] face and said, 'Get up or I am going to kick your ass.'" (*Id.* ¶ 11.) Gifford's Amended Complaint

alleges that Stacie Gardner, Correction Officer, violated his constitutional rights by failing to report Bott's threat. (Doc. 11 ¶ 71.) Gifford does not allege that Bott followed through on his threat. Bott does not recall going to see Gifford with Tipple, and he denies ever threatening Gifford.[2] (Doc. 60-4 ¶¶ 5, 9.) Gardner testified she did not hear Bott tell Gifford he was going to kick his ass; if she had, she would have reported it. (Doc. 60-18 ¶ 5.)

According to Gifford's medical records, on Sunday morning, June 24, 2012, Tipple saw Gifford sometime around 6:30 a.m. in his cell. (Doc. 54-1 at 76; doc. 60-3 ¶ 5; doc. 60-28 ¶ 5.) While there, Tipple spoke with Gifford and he told her that he had hurt his back playing softball; he denied any numbness or tingling. (Doc. 54-1 at 76; doc. 60-28 ¶ 5.) Tipple contacted defendant Mark Holbrook, M.D., FCI–Talladega's Clinical Director, who instructed her to give Gifford a 60 mg shot of Toradol. (Doc. 60-28 ¶ 5; doc. 54-1 at 76.) Toradol is a non-steroidal anti-inflammatory drug (NSAID), that is used for moderate to

---

[2]Bott testified –

Regarding Gifford's claim I ignored his pleas for assistance and threatened him, I adamantly deny the allegations. As verified in the Camp Log Book, I notified the Operations Lieutenant as soon as I became aware of Gifford's condition. An ambulance arrived at the institution at around 8:44 a.m. Although I was no longer working when the ambulance arrived [Bott's shift ended at 8:00 a.m.], I clearly responded to Gifford's condition in a timely manner. Further, I never made, nor would I ever make, such a statement to an inmate. I treated all of the inmates with respect, and I had no negative interaction or history with Gifford.

(Doc. 60-4 ¶ 9.)

severe pain. (Doc. 60-3 ¶ 4.) Tipple testified that she and Bott had been very careful when they turned Gifford on his side for the shot. (Doc. 60-28 ¶ 5.)

Tipple waited in Health Services to see "if the shot worked." (*Id*. ¶ 6.) Less than an hour later, at approximately 7:15 a.m., inmates notified Bott that Gifford "could not move." (Doc. 60-4 ¶ 5; *see also* doc. 54-1 at 76.) Bott does not recall this incident. (Doc. 60-4 ¶ 5.) However, according to the Camp Log Book, Bott called the Operations Lieutenant at 7:22 a.m. and reported that Gifford was having back pain and could not move. (*Id*.; doc. 60-5 at 4.) Tipple returned to Gifford's Unit and at that time he told her the shot had not worked at all. (Doc. 60-28 ¶ 6.) An officer attempted to take Gifford to Health Services for further evaluation; however, he "started yelling when the officer and [Tipple] attempted to log roll him [onto a stretcher]." (Doc. 54-1 at 76.) They "did not attempt to move him after that." (*Id*.)

She noted Gifford was cooperative, but irritable and agitated. (Doc. 54-1 at 76.) He "[a]ppear[ed] well" and showed no apparent distress. (*Id*.) Also, she noted that Gifford "denie[d] numbness or tingling" and that he was "[m]oving all extremities." (*Id*.) Tipple telephoned Holbrook and Holbrook gave Tipple a verbal order to send Gifford to the emergency room [ER] at Northeast Alabama Regional Medical Center [the Hospital] for further evaluation and treatment. (*Id*.; doc. 60-3 ¶ 5; doc. 60-28 ¶ 6.) An ambulance arrived at 8:44 a.m. to take Gifford to the Hospital. (*See* doc. 60-5 at 4.)

When Gifford arrived at the Hospital, he was seen by defendant George Smith, M.D. (Doc. 54-4 at 11-12; doc. 60-3 ¶ 6.) Dr. Smith is licensed to practice medicine in the State of Alabama. (Doc. 24-12 ¶ 4.) On June 24, 2012, he was working in the ER at the Hospital pursuant to an agreement between his employer, Emergency Room Services of Alabama [ERSA] and the Hospital. (*See id*.; doc. 63-1 ¶¶ 5-6, at 3-4.)

The agreement between the Hospital and ERSA provided ER staffing. (Doc. 63-1 ¶ 6, at 3-4.) The terms of the agreement required ERSA to "provide Emergency Department Services (Department Services) . . . to the Hospital," and "Emergency Department Services" include the services of physicians in the ER. (Doc. 63-1 at 7-8.) "Emergency Department Services" specifically include "[e]valuation and treatment of acute medical needs of every patient submitting himself/herself to the [ER] for medical care . . . .," and "[t]reatment of all [ER] patients requiring medical care regardless of ability to pay . . . ." (*Id*. at 24, 25.) Doctors working in the Hospital's ER under this agreement are not employees or agents of the Hospital. (*Id*. at 19.)[3] "The Hospital [does] not have or exercise control or direction over

---

[3]The agreement states:

> No relationship of employer or employee is created by this Agreement, it being understood that ERSA will act hereunder as an independent contractor to Hospital. None of the Department Professionals performing Department Services for ERSA pursuant to this Agreement . . . shall have any claim under this Agreement or otherwise against the Hospital for any compensation . . . of any kind. The Hospital shall neither have nor exercise any control or direction over the methods by which Department Professionals and other ERSA employees perform ERSA's duties and responsibilities hereunder. The Hospital acknowledges that its sole interest with respect to the Department Services delegated pursuant to this Agreement is to insure that such resulting

the methods by which [ER doctors] perform [their] duties/responsibilities" to provide medical treatment to patients in the ER." (*Id*.) Dr. Smith was not an employee or agent of the Hospital on June 24, 2012. (Doc. 24-1 ¶ 4; doc. 63-1 ¶ 5, at 3.)

Also, Dr. Smith's freedom "to order any tests [he] determined to be medically necessary," was not cabined by Dr. Holbrook and/or FCI-Talladega. (Doc. 60-3 ¶ 34.) According to Dr. Holbrook, "Neither myself nor FCI-Talladega had any input on what tests should be ordered for any inmate in the care of the [H]ospital or any outside medical entity." (*Id*.) The Hospital did not have an agreement with the BOP regarding the provision of medical services to Talladega inmates; however, they had an agreed Pricing Schedule.

The x-rays of Gifford's back included five views of the lumbar spine, which were read by a radiologist. (Doc. 54-4 at 13; doc. 60-3 ¶ 6.) The x-rays showed "[n]o acute fracture, malalignment, or skeletal lesion." (Doc. 54-4 at 13; Doc. 60-3 ¶ 6.) The resulting "impression" of the radiologist was "[n]o acute skeletal injury." (Doc. 54-4 at 13.) Dr. Smith diagnosed Gifford "with a lumbosacral strain," which is consistent with Gifford's reported injury caused by swinging a bat. (*Id*. at 4; doc. 60-3 ¶ 6; doc. 1-1 ¶ 16.) Dr. Holbrook testified, "A lumbar strain results from stretching of the ligaments, tendons, or muscles, of the lower back. The stretching may cause microscopic tears in those muscles.

---

Department Services shall be performed and rendered in a competent, efficient and satisfactory manner and in accordance with applicable law, regulations, and the Quality Standards required by the Medical Staff and the Joint Commission on Accreditation of Healthcare Organizations.

(Doc. 63-1 at 19-20.)

The muscle normally heals on its[ ] own. If the pain lasts for more than three months it['s] considered chronic." (Doc. 60-3 ¶ 6.) According to Dr. Smith:

> In my professional opinion, Mr. Gifford received medical care for his symptoms that are within the applicable standard of care. My diagnosis of Mr. Gifford was correct and within the applicable standard of care. Furthermore, it is my professional opinion that not ordering an MRI on June 24, 2012[,] for Mr. Gifford was appropriate and within the applicable standard of case as an MRI was not indicated on this date. At no time did my care and treatment of Mr. Gifford fall below the applicable standard of care.

(*Id.* ¶7.) Dr. Reginald Hall, an orthopedic surgeon with the BOP, agreed; he testified, "An MRI at the first emergency room visit was unnecessary because[,] even if Gifford had been diagnosed [with a herniated disc] at that time, in the absence of significant neurologic deficits(s), he should have continued with non-operative treatment." (Doc. 60-11 ¶¶ 1, 3.) The treatment of a lumbar strain "consists of rest and medication for pain and muscle spasm." (Doc. 60-3 ¶ 6.)

Dr. Smith prescribed Percocet and Robaxin for Gifford's pain and muscle spasms. (Doc. 54-4 at 3; doc. 60-3 ¶ 6.) In his discharge papers, Gifford was told that he may have pain and stiffness for a few days, but he "should watch for a significant change or worsening of [his] symptoms." (Doc. 54-4 at 4.) His discharge papers specifically stated:

> YOU SHOULD SEEK MEDICAL ATTENTION IMMEDIATELY . . . IF ANY OF THE FOLLOWING OCCURS:
>
> – Numbness (loss of sensation/feeling) or tingling in the legs.
>
> – Weakness in the legs.
>
> – Problems controlling your bowels or bladder (you soil or wet yourself).

– Severe increase in pain. [or]

– Your pain does not improve within 4 weeks or is severe enough to seriously
limit your normal activities.

(Doc. 54-4 at 4-5.) Gifford was discharged from the ER and returned to the institution that

day. (Doc. 60-3 ¶ 6.)

When Gifford returned to FCI–Talladega, he was seen by Laureano Marasigan, a mid-

level practitioner [MLP][4] in the Health Services Unit. (Doc. 54-1 at 74; doc. 60-7 ¶ 1.)

Marasigan does not remember Gifford. (Doc. 60-7 ¶ 5.) However, according to Gifford's

medical records, Marasigan reviewed the discharge instructions and noted that two of the

drugs Gifford was prescribed – Percocet and Robaxin[5] – were "non-formulary" drugs,

meaning they were not available from the pharmacy at FCI–Talladega;[6] therefore, he

---

[4]A "mid-level practitioner," or MLP, is "an individual practitioner, other than a physician, dentist, veterinarian, or podiatrist, who is licensed, registered, or otherwise permitted by the United States or the jurisdiction in which he/she practices, to dispense a controlled substance in the course of professional practice. Examples of mid-level practitioners include, but are not limited to, health care providers such as nurse practitioners, nurse midwives, nurse anesthetists, clinical nurse specialists and physician assistants who are authorized to dispense controlled substances by the State in which they practice." 21 C.F.R. § 1300.01.

[5]Robaxin is a muscle relaxant used to "treat[ ] acute musculoskeletal pain." *Medrano v. Smith*, 161 Fed. Appx. 596, 597 (7th Cir. 2006)(citing PHYSICIAN'S DESK REFERENCE 770 (60th ed. 2006); THE PDR FAMILY GUIDE TO PRESCRIPTION DRUGS 598 (9th ed. 2002)); *see also Dang by and through Dang v. Sheriff, Seminole Cty.* 856 F.3d 842, 847 (11th Cir. 2017). Gifford does not complain about not receiving a muscle relaxer.

[6]"The formulary system . . . is a method for evaluating and selecting suitable drug products for the formulary of an organized health-care setting. The BOP's formulary is a list of medications that are considered by the organization's professional staff to ensure high quality, cost-effective drug therapy for the population served." Federal Bureau of Prisons

substituted Tylenol with Codeine.  (Doc. 54-1 at 74; doc. 60-7 ¶ 5.)  Gifford stated that Tylenol with codeine "never relieved the pain."  (Doc. 1-1 ¶ 19.)  Noting the diagnosis of lumbosacral sprain/strain, Marasigan gave Gifford a three-day convalescence pass and told him to use warm compresses and to avoid heavy lifting.  (Doc. 54-1 at 74; doc. 60-7 ¶ 5; doc. 60-8.) According to Gifford, Marasigan also instructed him "to walk the track."  (Doc. 1-1 ¶ 21.)

Gifford alleges that he went two or three ***weeks*** before he was issued a lower-bunk pass, but the records shows he was given a lower-bunk pass two ***days*** after his ER visit. (Doc. 1-1 ¶¶ 21-22, 56; doc. 54-9 at 2; doc. 60-9 at 2.)  Dr. Holbrook reviewed the ER records, and he gave Gifford a temporary single cell and lower-bunk pass effective June 26. (*See* doc. 54-1 at 74-75; doc. 60-9 at 2.)  The lower-bunk pass was renewed on July 9, 2012, (doc. 60-9 at 3), and again on July 30, 2012, (*id*. at 4; *see also* doc. 60-3 ¶¶ 9, 14).

Gifford contends that a week after he moved to a lower bunk, Bott told him  he was in the wrong bed; Bott allegedly "raised his voice and threatened to lock [Gifford] up for switching beds."  (Doc. 1-1 ¶ 26.)  Bott denies ever threatening Gifford.  (Doc. 60-4 ¶ 9.) According to Gifford, Bott sent him to see defendant Harold "Reese" Hardin, Correctional Counselor, and Hardin allegedly "threatened to lock [Gifford] up or make [him] push a lawn mower for switching beds."  (Doc. 1-1  ¶¶ 26-27; *see also* doc. 60-17 ¶ 1.)  Hardin denied

---

Health Services, NATIONAL FORMULARY PART I, 6 (2016), *available at* https://www.bop.gov/resources/pdfs/formulary.pdf.  Although inmates may receive non-formulary prescription drugs, a request for non-formulary medications must be "thoroughly justified," which includes stating "why the formulary agent cannot be used."  *Id*.

he ever threatened Gifford with pushing a lawnmower.  (Doc. 60-17 ¶ 3.)  Regardless of the

threats, Hardin told Gifford that he "would do the bed change."  (Doc. 1-1 ¶ 27.)

Dr. Holbrook testified:

> On June 26, 2012, MLP Honoria Dela Cruz provided Gifford with a MDS for a temporary lower bunk, A.K.A. lower bunk pass.  The MDS for a lower bunk was not provided immediately after Gifford's reported injury because he did not meet the criteria in accordance with the Lower Bunk Criteria Memorandum issued by RADM Newton E. Kendig, Assistant Director, Federal Bureau of Prisons on June 5, 2012.  The lower bed bunk criteria denotes medical conditions that must be present in order for a pass to be issued, and whether the pass should be temporary or mandatory.  When Gifford was seen on June 23, 2012, his exam revealed no significant findings . . . other than tenderness.  Thus, he did not qualify for a lower bunk pass at that time.

(Doc. 60-3 ¶ 8.)  Any member of the Unit Team – comprised of the Unit Manager, two Case

Managers, two Counselors, and a Unit Secretary – can make a bed assignment.  (Doc. 60-17

¶7.)  Hardin testified:

> Changing bed assignments at the Camp is routine and part of my job.  Lower bed bunks are always preferred over upper bunks.  Once a bed is assigned, I have no problems reassigning an inmate to a lower bunk as long as the inmate has appropriate documentation from the health services department.  If an inmate approached me, and he did not have a  lower bunk pass[,] I would contact the health services department for verification.  If no one in the health services department was available, I would advise the inmate I can't make the change without appropriate documentation.

(Doc. 60-17 ¶ 6.)  According to Hardin, Gifford did not ask him for a lower-bunk assignment

until July 5, 2012, and he assigned him a lower bunk that same day.  (Doc. 60-17 ¶ 4.)

Gifford did not respond to defendants' Special Reports; therefore, he has not presented any

evidence to dispute the medical records and documents submitted by defendants that show

he was issued a lower-bunk pass on June 26, 2012, and that he waited until July 5, 2012, to have Hardin reassign him to a lower bunk.

Gifford alleges that the "medical staff refused [his] request for a stool to use in the shower, forcing [him] to stand up while showering causing [him] constant pain and fear of failing down every time [he] showered." (Doc. 1-1 ¶ 52.) His medical records do not show that he ever requested a shower stool. (Doc. 60-3 ¶ 32; *see also* doc. 54-1 at 42-47, 56-79.) Gifford did not rebut this evidence.

Gifford was next seen in Health Services on July 9, 2012, with complaints of recurrent back pain. (Doc. 60-3 ¶ 8; doc. 54-1 at 72.) He was seen by defendant Mounir Mourtada, MLP. (Doc. 54-1 at 72; doc. 60-3 ¶ 12; doc. 60-10 ¶ 3.) Mourtada noted that Gifford reported his back pain was 6/10 on the pain scale. (Doc. 54-1 at 72.) Upon examination, Mourtada noted tenderness and decreased range of active motion; however, the examination was negative for a decreased range of passive motion, crepitus, clicking, popping, and locking. (*Id*.) Mourtada found that Gifford's symptoms were consistent with a back sprain and/or strain. (Doc. 60-10 ¶ 3.) He assessed Gifford's "[s]prain and strain of lumbosacral," from June 24, 2012, as "[i]mproved." (Doc. 54-1 at 72-73) Mourtada ordered Gifford be given 500 mg of Naproxen twice daily for 10 days. (*Id*. at 73.) Gifford alleges that Mourtada told him he was going to start the paperwork to get him an MRI. (Doc. 1-1 ¶¶ 29-30.) The medical records do not indicate that an MRI was requested or ordered at this time. (*See* 54-1 at 72-73.)

Gifford returned to Health Services on July 24, 2012, slightly more than two weeks later, when he saw Marasigan for renewal of his medication for his back pain. (Doc. 54-1 at 70; *see* doc. 60-7 ¶ 6.) At that time, Gifford reported his back pain was 4/10 and that his back was "tender." (Doc. 54-1 at 70.) Marasigan assessed Gifford's back injury to be "[a]t treatment goal." (*Id.*) He prescribed 25 mg of Indomethacin[7] three times a day for 14 days. (*Id.*; doc. 60-7 ¶ 6.)

On July 27, 2012, three days later and over a month after he had been diagnosed with a back strain or sprain, Marasigan saw Gifford again, this time in his Housing Unit. (Doc. 54-1 at 66; doc. 60-7 ¶ 7.) According to his medical records, Gifford told Marasigan that, "while he was taking a shower he felt tingling on both lower extremities. After he finished showering and was walking out of the shower, he felt numbness of lower extremities and he could not feel where he was stepping and he got scared. He was helped to his cubicle by other inmates." (Doc. 54-1 at 66.) By the time Marasigan arrived, Gifford was able to stand and walk, but he had continuing numbness in his left foot, back pain of 5/10, and muscle spasms in his left buttock and thigh. (*Id.*; doc. 60-7 ¶ 7.) Marasigan performed a neurological exam on Gifford, which demonstrated that his lower extremities had "active

---

[7]Indomethacin is an NSAID "used to relieve moderate-to-severe pain, tenderness, swelling, and stiffness." *Cruz v. Colvin*, No. 1:14-CV-03308-AJB, 2016 WL 1237853, *5 n.17 (N.D. Ga. Mar. 29, 2016)(citing Medline Plus, Indomethacin, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a681027.html).

movement against gravity and resistance" or "some resistance."[8]  (*Id*.)  Gifford also had

diminished sensation on the dorsal aspect of the left foot.  (*Id*.)  Gifford was diagnosed with

---

[8]Marasigan noted the following results of his neurologic examination:

Strength-Hip Flexion L2/L3/L4 & Illiopsoas
        Yes:  4 – Active [Movement] Against Gravity & Some Resistance

Strength-Hip Adduction L2/L3/L4 & Adductors
        Yes: 4-Active [Movement] Against Gravity & Some Resistance

Strength-Hip Abductors L4/L5/S1 and Gluteals
        Yes: 4-Active Movement Against Gravity & Resistance

Strength-Hip Extension S1 and Gluteus Maximus
        Yes: 4-Active Movement Against Gravity and Resistance

Strength-Knee Extension L2/L3/L4 & Quadriceps
        Yes: 4-Active Movement Against Gravity and Resistance

Strength-Knee Flexion L4/L5/S1/S2 & Hamstrings
        Yes: 4-Active Movement Against Gravity and Resistance

Strength-Foot Dorsiflexion L4/L5
        Yes: 4-Active Movement Against Gravity and Resistance

Strength-Foot Plantar Flexion S1
        Yes: 4-Active Movement Against Gravity and Resistance

Coordination - Gait
        Yes: Guarded Gait

Sensory-Light Touch
        Yes:  Hypoesthesia

Exam shows [diminished] sensation on the dorsal aspect of the left foot.

(Doc. 54-1 at 66-67.)

peripheral neuropathy, unspecified,[9] and given a shot of Ketorolac, an anti-inflammatory drug. (*Id*. at 67.) He was told to "[f]ollow-up at Sick Call as [n]eeded." (*Id*.)

The following day, July 28, 2012, Marasigan was "called down to the [the Housing Unit] because Inmate Gifford was complaining of [numbness] and pain on both lower extremities and he could not stand up." (*Id*. at 62; doc. 60-7 ¶ 8.) Gifford told Marasigan that his condition was "getting worse" and that he "could not feel his toes." (Doc. 54-1 at 62; doc. 60-7 ¶ 8.) Marasigan examined Gifford and noted, "twitching and spasm of the muscles of both lower extremities on palpation and on weight bearing with tenderness on the [posterior] aspect." (Doc. 54-1 at 62; doc. 60-7 ¶ 8.) The results of his neurologic examination were the same as the day before. (Doc. 54-1 at 62-63.) Marasigan assessed Gifford with peripheral neuropathy, unspecified, and noted that his condition had "Not Improved." (*Id*. at 63.) Gifford was prescribed 60 mg of Ketorolac twice a day for three days. (*Id*.) Marasigan told Gifford "to follow up at sick call on Monday to be referred to Physician." (*Id*.; *see also* doc. 1-1 ¶ 34 [Gifford alleges that Marasigan told him, "You need to see a specialist."].) Marasigan testified that he "did not send Gifford to the emergency room because[,] based on [his] experience, [he] did not consider the condition an emergency." (Doc. 60-7 ¶ 8.) He did not see Gifford again until March 2014. (*Id*. ¶ 9.)

---

[9]According to Dr. Holbrook, "Peripheral neuropathy is damage to or disease affecting nerves which may impair sensation, movement or other aspects of health depending on the type of nerve affected[.] Common causes include systemic diseases such as diabetes, vitamin deficiency, medication or traumatic injury." (Doc. 60-3 ¶ 11.)

On Sunday, July 29, 2012, Gifford was seen in Health Services by defendant Sofronio Paco, MLP/physician's assistant, complaining of low-back pain and numbness. (Doc. 54-1 at 58; doc. 60-12 ¶ 1.) Gifford alleges that defendant Anthony "Ace" Williams, a Senior Officer Specialist, "loaded [him] in a wheelchair and pushed [him] to [Health Services], but [he] was unable to get out of the wheelchair [and on] to the examination table, so Mr. Williams grabbed [him] in a bear hug and hefted [him] up on to the table causing sheer agony in [his] lower back." (Doc. 1-1 ¶ 36; *see* doc. 60-16 ¶ 1.) Paco denies he instructed an officer to put Gifford in a bear hug. (Doc. 60-12 ¶ 5.) He testified that the officer had helped Gifford get on the examination table and he had tried not to hurt him. (*Id*.) Williams testified that he would never intentionally cause pain to an inmate and he had tried only to help. (Doc. 60-16 ¶ 4.)

Upon examination, Paco noted "there is tenderness (6/10)[10] to palpation on the paravertebral muscles bilaterally;" the results of his neurologic examination of Gifford were identical to Marasigan's findings on July 27 and 28, 2012. (*Id*. at 59 [footnote added].) He also assessed Gifford with peripheral neuropathy, unspecified, and noted Gifford's condition had not improved; Paco added an "initial" diagnosis of "backache, unspecified." (*Id*.) Paco contacted Dr. Holbrook, who ordered an x-ray because of Gifford's "complaint of low back pain for three days." (*Id*. at 60; doc. 60-3 ¶ 13.) Even though Gifford's symptoms were consistent with the diagnosis of back strain or sprain made by Dr. Smith in the Hospital's

---

[10]Gifford testified that he told Paco his pain was "twenty" on a ten-point scale. (Doc. 1-1 ¶37.)

ER, Dr. Holbrook sought to do another x-ray "to determine if his condition was becoming worse." (Doc. 60-3 ¶ 13.) Gifford alleges that he asked to go to the Hospital, but Paco told him, "Tonight is my early night, why should I help you, I am supposed to go home early tonight." (Doc. 1-1 ¶ 39.) Paco testified that he had waited to see Gifford until after his shift had already ended at 6:00 p.m. (Doc. 60-12 ¶ 6 ["I was scheduled to get off of work at 6:00 p.m. However, I waited for Gifford to come to Health Services and I stayed to assist him."].) Gifford did not rebut this testimony.

Monday, July 30, 2012, Gifford arrived at Health Services "on a wheel chair" and screaming. (Doc. 54-1 at 46.) Mourtada, who was examining another inmate at the time, noted that, when he went to see what was happening, he saw Gifford "on the floor screaming of pain [and] he claimed that he [could not] feel his legs and wanted to go [to] the outside hospital." (*Id.*; doc. 60-10 ¶ 4; *see* doc. 1-1 ¶ 40.) Gifford was able to walk into Mourtada's office. (Doc. 60-10 ¶ 4.) He told Mourtada that his pain was 10/10 and its onset was 1 to 5 hours before arriving in Health Services. (Doc. 54-1 at 46.) Gifford said that Mourtada asked him, "Why are you crying? Grown men don't act like this," (doc. 1-1 ¶ 41), which Mourtada denies, (doc. 60-10 ¶ 6). Mourtada examined Gifford and noted "Muscle Spasm, Tenderness, Decreased Range of Active Motion, Decreased Range of Passive Motion," positive "Straight Leg Raise Test," and a "Spastic Gait." (*Id.* at 47.) "Gifford was diagnosed with temporary acute backache – unspecified, peripheral neuropathy – unspecified, and muscle spasm." (Doc. 60-3 ¶ 14; *see also* doc. 54-1 at 47; doc. 60-10 ¶ 4.)

Mourtada contacted Dr. Holbrook about Gifford's complaints and Dr. Holbrook "decided to order an MRI in order to rule out [a] herniated versus ruptured disc in [the] L-S spine." (Doc. 60-3 ¶ 14; doc. 60-10 ¶ 4.) Dr. Holbrook found that the need for an MRI was not "emergent at the time as Gifford was displaying classic signs of peripheral neuropathy (a condition which cannot be cured)." (Doc. 60-3 ¶ 17.) Dr. Hall, defendant's expert, testified, "[W]hether to send Gifford to the emergency room on July 30, 2012, in my opinion, [was] a judgement call. In my opinion, it was appropriate to let objective findings, (or lack of findings) that supported the inmate's complaints[,] direct BOP's care, and not more dramatic behavior that could be an attempt to get the staff to do something or send the inmate out of the institution." (Doc. 60-11 ¶ 3.)

A week later, on August 6, 2012, Gifford returned to the Health Services Unit for the purpose of refilling his psoriasis medication. (Doc. 54-1 at 42; doc. 60-3 ¶ 14; doc. 60-10 ¶ 5.) While there, he complained to Mourtada that he still had severe lower back pain and that "he [had] started losing urine without noticing 2 days ago and he [could not] control his urination." (Doc. 54-1 at 42; doc. 60-10 ¶ 5.) Gifford also reported being unable to walk and unable to feel his legs and thighs. (*Id.*) Dr. Holbrook told Mourtada to send Gifford to the ER for "MRI of L-S spine, immediate medical attention and [diagnosis]," to rule out a herniated disc and cauda equina syndrome. (Doc. 60-10 ¶ 5.) Dr. Holbrook testified in his declaration that Gifford's incontinence led him to deem Gifford's situation to require immediate medical attention outside Health Services. (*See* doc. 60-3 ¶ 16; *see also* doc. 60-

10 ¶ 5.) He testified, "Cauda equina [syndrome] is an impingement on the lower spinal cord which left untreated can result in permanent paralysis. This condition presented a possible emergency situation." (*Id*.) Cauda equina syndrome [CES] –

> is a rare syndrome described as a collection of signs and symptoms associated with compression of the cauda equina. Cauda equina is Latin for "horse's tail," and refers to the collection of nerve roots in the lower spinal canal. . . .
>
> > CES is a rapidly-evolving neurologic disorder related to spinal cord and spinal cord leash compression which causes a very specific constellation of symptoms, which are necessary in order to make the diagnosis. These symptoms are: (1) saddle anesthesia (*i.e.*, no sensation in the legs, anus or accompanying regions), (2) rapidly progressing neurologic weakness progressing to paralysis and (3) bladder dysfunction. Indeed, . . . bladder dysfunction is the "hallmark" symptom of CES.

*Blake v. United States*, No. 10-CV-610S, 2017 WL 1371000, *2 (W.D.N.Y. Apr. 17, 2017)(quoting *Jimerson v. United States*, No. 99-CV-0954E(SR), 2003 WL 251950, *2 (W.D.N.Y. Jan. 13, 2003))(internal quotations and citations omitted).

FCI-Talladega does not have a MRI on site. (Doc. 60-3 ¶ 17.) Therefore, when an MRI is ordered . . . a certain amount of logistical planning [is involved,] including coordinating with an outside medical facility and correctional services to transport the inmate. (*Id*.) Correctional services also determines the level of security needed for the inmate's transportation. (*Id*.) Dr. Holbrook testified:

> When I ordered the MRI on July 30, 2012, I did not deem the need for the MRI as emergent at the time as Gifford was displaying classic signs of peripheral neuropathy (a condition which cannot be cured). Thus, the request for the MRI was being processed through normal channels. However, on

August 6, 2012, ***when Gifford's symptoms changed***, I determined the need for the MRI was emergent, and I had him sent immediately to the emergency room at an outside hospital.

(*Id*. [emphasis added].)  Also, he stated:

> Although it would be easy to look back, and think Gifford should have been sent to the emergency room earlier, ***it is when the symptoms changed to those associated with Cauda Equina syndrome, that emergent evaluation was required***.  Although Gifford had been complaining of pain and numbness, he was being treated for what was felt to be spasm and neuropathy.  Many of his complaints were subjective, and did not seem to fit the objective findings at the time.  Although the neuropathy, similar to what is seen with sciatic nerve pain and impingement, can be caused by herniation or a disc bulge ***it did not rise to the emergent level until he had the incontinence which can be associated with Cauda Equina Syndrome***.  Cauda Equina [syndrome] often presents with saddle numbness, or incontinence, and left untreated, can result in permanent paralysis.  At the point this was suspected, the patient was sent to the ER immediately.

(*Id*. ¶ 35 [emphasis added].)

Gifford testified that "[m]edical refused to provide [him] with adult diapers" prior to August 6, 2012.  (Doc. 1-1 ¶ 55.)  However, the record shows that Gifford did not complain about incontinence to anyone in Health Services before August 6, 2012.  Moreover, on that day, August 6, 2012, he was sent out from FCI-Talladega and did not return until a year later.  Therefore, Gifford did not ask for adult diapers and no one "refused" to provide them after Health Services was aware of his incontinence issues.

Once Gifford arrived at the ER, he had an MRI that "showed a significant disc bulge at L4, L5, and S1."  (Doc. 54-1 at 41; doc. 60-3 ¶ 18.)  The ER physician told Dr. Holbrook that Gifford also had "lost [sphincter] tone in the rectum and [had] some foot drop."  (Doc.

54-1 at 41.)  Due to the ER physician's concern about [CES], the Hospital transferred Gifford to Princeton Hospital in Birmingham for treatment by R. Cem Cezayirli, M.D., a neurosurgeon.  (*Id*.; *see also id*. at 215-16.)

At Princeton, Dr. Cezayirli ordered a myelogram and told Dr. Holbrook that he planned to operate on Gifford the following day.  (*Id*. at 37.)  Dr. Cezayirli diagnosed Gifford with a "large herniated disk L4-5 with complete block," and "cauda equina syndrome."  (*Id*. at 182.)  As planned, Dr. Cezayirli performed a lumbar discectomy and decompressive laminectomy on August 8, 2012.  (Doc. 60-3 ¶ 19; doc. 54-1 at 182-83.)  The surgery went well and thereafter Gifford was able to ambulate with a walker.  (Doc. 60-3 ¶¶ 20-21; doc. 54-1 at 29, 32, 182-83.)  After surgery, however, Gifford continued to have bowel and bladder continence issues during his stay at Princeton.  (Doc. 60-3 ¶ 22; *see* doc. 54-1 at 25, 28, 118, 126.)

Dr. Dr. Holbrook was told that Gifford would need physical therapy, so he requested to transfer Gifford to a Federal Medical Center to receive the appropriate care.  (Doc. 60-3 ¶23.)  On August 27, 2012, Gifford was transferred to transitional care at  Coosa Valley Medical Center to continue physical therapy.  (*Id.* ¶ 24.)  While there, Gifford's condition continued to improve and he was able to walk with a quad cane.  (*Id*.)  On November 14, 2012, Gifford was transferred to the Federal Medical Center in Lexington, Kentucky.  (*Id*. ¶ 25.)

Gifford remained in Lexington until he was "independent with all Activities of Daily Living" and he felt he no longer needed physical therapy. (*Id*. ¶ 26.) He was transferred back to FCI–Talladega on August 26, 2013, (*id*. ¶ 27), where he remained until he was released in May 2016, (doc. 60-1 at 4).

On May 28, 2013, Gifford filed an "Emergency BP-9."[11] (Doc. 60-15 at 10.) In the Grievance, he states in part:

> In June 2012[,] I suffered an injury playing Softball at [Talladega] FPC. I swung the bat and somehow twisted my back. I went to the Officers and Sick-Call and nothing was done except I was given Ibuprofen. I stayed on the floor the remainder of the day and night and half the next day, (even during Counts). After a couple of weeks, I got up for the 10:00 count and felt the same pain as before shoot through my back and legs. The PA who saw me stated I needed to see a Specialist. I had gone back to sick-call upon experiencing the same pain as before. The PA gave me a shot and sent me on my way. This went on for a month UNTIL I lost control of my bladder and my bowels. By the time I got [an] MRI, the Hospital had to admit me for EMERGENCY SURGERY. . . . It has been six (6) months since the surgery and I still have no movement in my right foot and several "dead spots" in BOTH legs. The Doctors who helped me in Birmingham have said this could have been totally avoided. Now, I continue to suffer and struggle because as Mr. Paco (one of the PA's I saw in Talladega) said to me, I am supposed to go home early tonight, I am NOT going to help you. This is clearly a violation of my 8th Amendment right, this is a violation of the duty to treat, delay in medical care and deliberate indifference to my serious medical need. . . .

(Doc. 60-15 at 10.)

Defendant John Rathman, then-Warden of FCI Talladega, denied the grievance on June 12, 2013. (Doc. 60-15 at 8-9.) He stated:

---

[11]In this Grievance, Gifford alleges that he had filed a BP-9 grievance on April 1, 2012, that was lost. (Doc. 60-15 at 10.)

This is in response to your Request for Administrative Remedy (BP-9) receipted on June 6, 2013, in which you state you suffered an injury in June of 2012 at FPC Talladega while playing softball. You allege you have been subjected to negligence and deliberate indifference by not having your medical needs met in a timely manner.

After consulting with medical staff, it was revealed that an injury report was completed on June 23, 2012, in which you complained you hurt your back while playing softball. You were given a prescription of Ibuprofen 800 mg and instructed to follow up with sick call as needed. On June 24, 2012, you continued to complain of pain. After review, the physician ordered a pain injection and you were transferred to the local emergency room via ambulance for further evaluation. You returned back [to] the institution the same day with reports/X-rays of your lumbar region reflecting negative findings. You were given a diagnosis of Lumbosacral Sprain/Strain and were given a convalescence pass for 3 days and [instructed] to use warm compresses. You were also prescribed Tylenol with Codeine at that time. You made sick call July 9, 2012, for continuation of back pain, Naproxen was added to your pain regimen and a lower bunk pass was assigned. You made sick call several more times complaining of back pain which was addressed based on your medical needs. You had an emergent episode on July 27, 2012, where you experienced back pain, numbness and tingling of lower extremities while getting out of the shower. You were given an injection for your discomfort and instructed to notify medical if symptoms worsened or did not improve. Again on July 28, 2012, you had an emergent episode where you were experiencing pain, numbness and tingling and you were given another injection for your discomfort. On July 29, 2012, you were evaluated at sick call and additional X-rays were ordered. On August 6, 2012, you reported to the MLP that you had experienced a loss of bladder and bowel control over the last 2 days. You also reported you had numbness in your legs and were unable to walk. At this time, a decision was made to transport you to the local Emergency Room via ambulance for stat MRI. After arriving in the ER and reviewing the MRI results, a decision was made to transfer you to Princeton Hospital in Birmingham, Alabama, for back surgery. On August 28, 2012, you were transferred to Coosa Valley Hospital for long term care. You remained at Coosa Valley Hospital until you were transferred to FMC Lexington on November 14, 2012.

Therefore, you were evaluated and treated by the proper medical providers, and at no time, was there a delay of medical care or a deliberate indifference

in regard to your medical needs. Additionally, your request for monetary compensation needs to be addressed via the Federal Tort Claims Act.

Your Request for Administrative Remedy is for informational purposes only.

Medical staff will continue to provide you medical care according to Program Statement 6031.01, Patient Care and medical standard of care. If you have any further question or concern, you may address them with the Health Services Administrator.

(*Id.*)

On June 25, 2013, Gifford appealed Rathman's decision to the Mid-Atlantic Regional Office. (Doc. 60-15 at 7.) This appeal was denied on the ground that, "There is no evidence to suggest deliberate indifference to your medical needs." (Doc. 60-15 at 6.)

Gifford filed an appeal of the Regional Decision on August 11, 2013, in which he stated:

I am appealing the "for informational purposes only" response of the Region for the same reasons. While providing an eloquent chronology of what has happened to me, not one time has anyone taken responsibility for what has happened to me as a DIRECT result of the delay in treatment by the BOP, the denial of treatment by the BOP, and the fact that the Medical Staff were so incompetent they didn't readily recognize that I had damaged two discs in my back. It was NOT UNTIL I LOST CONTROL OF MY BLADDER AND BOWELS that I was finally sent to a Hospital where I was FINALLY seen by competent Medical Staff. Not one of the Staff at the Hospital said, "it's time for me to go home and I am not going to do anything for you," as did Mr. Paco. This is not an isolated incident. Inmates are treated like fourth class human beings when it comes to Medical Care. I have had my L4-L5 disc removed, and I now have a condition called foot drop. . . . This is the lifetime disability I must contend with now because BOP Medical Staff were not competent to treat me and were unable to diagnose my complaint. . . . This is my Notice of Intent to Sue pursuant to 42 U.S.C. 1983, Bivens Complaint.

(Doc. 60-15 at 2.)  His appeal was denied on the ground that Gifford had "received medical care and treatment in accordance with evidence based standard of care and within the scope of services of the Federal Bureau of Prisons."  (*Id*. at 4.)

On April 17, 2014, Gifford filed an administrative tort claim with the BOP's Southeast Regional Office.  (Doc. 60-14 at 2.)  In this claim, he alleges:

> I twisted my lower back while playing softball and that result[ed] in me suffering a herniated disc, pinching my spine at [L4-5 and] S-1 and causing me great and unbearable pain for two months.  This injury was instantaneous after swinging the bat and I began seeking medical help [immediately].  I was denied the costs of an MRI for two months, but once the MRI occurred I never left the [hospital] due to emergency surgery which the doctors said should have been done the first night of care.  I required surgery to repair the delayed [damage] to my back.
>
> . . .
>
> FPC-TDG violated their non-discretionary duty to authorize payment for an MRI when I was taken to the emergency room on 6-24-12 at 10:13 p.m.[sic][12] The FBOP does not have the discretionary function to deny medical care to save budget monies and FPC-TDG refused that expense for two months causing me to suffer emotional duress, [disability], extreme pain, loss of gainful employment and mental trauma.

(*Id*. [footnote added].)

The instant action was filed on June 19, 2014.  (Doc. 1.)  Simultaneously, Gifford filed a "Motion to Amend the Original Claim," asking for "leave to amend this Complaint to include causes of action under the FTCA, upon the agency's final disposition of the timely filed FTCA claim."  (Doc. 2.)

---

[12]Gifford was admitted to the ER at 9:28 a.m. on June 24, 2012.  (*See* doc. 54-4 at 2, 9.)  He was discharged at 10:12 a.m., (*id*. at 14), and released at 10:41 a.m., (*id*. at 17).

Gifford's administrative tort claim was denied by the Southeast Regional Office of

the BOP on October 21, 2014; its letter to Gifford states, in pertinent part:

> Your claim has been considered for administrative settlement under the Federal Tort Claims Act (FTCA), Title 28 [U.S.C. §] 2672, et seq., and authority granted by [28 C.F.R. §] 0.172. . . .

> You allege that medical staff at FCI Talladega failed to provide you appropriate, timely treatment for a herniated disc and negligently refused to order an MRI of your back. Consequently, you seek $15,000,000 in damages for the pain and suffering you endured as well as loss of gainful employment.

> We have reviewed your claim along with reports from appropriate staff members. You arrived at FCI Talladega on September 28, 2010. On June 23, 2012, you reported to Health Services with a complaint that you hurt your back playing ball. You were given pain medication and instruction on using ice. The next day you were sent to the ER for an evaluation, where you were diagnosed with lumbo-sacral sprain or strain. Your x-rays were negative. The ER staff did not order an MRI or surgery, but prescribed pain medication. You were given convalescence for three days with advice for warm compresses and no heavy lifting.

> On July 9, 2012, you were again seen for back pain and given medication. On July 27, 2012, you reported tingling in your legs while taking a shower. You were noted to have muscle spasms in your back. You were able to stand and walk to health services, and your strength was noted at level 4 which is active movement against gravity and resistance. You were given a ketorolac injection. You returned the next two days day[, July 28-29, 2017,] in a wheelchair with the same complaint and level 4 strength, and you were given ketorolac injections. On July 30, 2012, you reported increased back pain. A request for an MRI was placed and you were given medication for muscle spasms. On August 6, 2012, you complained of severe back pain and incontinence for the past two days. In light of the incontinence, you were sent to the ER. An MRI was taken at the ER which showed a disc bulge at L4, L5, and S1, and you were transferred to a community hospital for surgery which was performed August 8, 2012.

> Your medical records do not support your claim that medical staff negligently failed to provide you with timely medical care or to order an MRI. While you

were in the ER on June 24, 2012, the hospital staff had complete control of your medical care, and was free to order any tests they wished. The ER staff did not order an MRI because they did not feel one was indicated. Additionally, the BOP is not responsible for the actions of outside contractors and, thus, is not liable for any decisions made by the hospital. You were repeatedly tested for nerve problems, and your back pain was appropriately treated with medication. FCI Talladega medical staff ordered an MRI when you reported increased pain, but your symptoms worsened before it could be taken, and you were immediately taken to the hospital.

The record indicates that your health concerns were addressed consistent with evidence[-]based[, ]proven effective care in accordance with approved policy. Therefore, based on the information provided, there is no evidence to support your claim that you have suffered any injuries or been denied medical care due to the negligent acts or omissions by FCI Talladega staff. Thus, your claim is denied.

(Doc. 60-14 at 4-5.)

After receiving this denial, Gifford filed a second Motion to Amend his Complaint, (doc. 9); both Motions to Amend, (docs. 2 and 9), were granted on December 5, 2014, (doc. 10). Gifford's Amended Complaint, (doc. 11), was filed on December 8, 2014.

## III. DISCUSSION

### A. ALABAMA MEDICAL LIABILITY ACT

Gifford alleges defendant George Smith, M.D., violated the Alabama Medical Liability Act [AMLA], Ala Code. § 6-5-484, et seq., when he "refused to order an MRI at the emergency room on 24 June 2012." (Doc. 11 ¶ 48.) Because Gifford has not supported his claim against Dr. Smith with expert testimony as to the standard of care required under the circumstances or that failure to order an MRI caused his injuries, his claim against Dr. Smith will be dismissed.

28

The [AMLA] imposes upon physicians a duty to "exercise such reasonable care, diligence and skill as physicians . . . in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case." Ala. Code 1975, § 6-5-484(a); see also *Keebler v. Winfield Carraway Hospital,* 531 So. 2d 841 (Ala. 1988). The plaintiff in a medical malpractice action must ordinarily establish the defendant physician's negligence through expert testimony as to the standard of care and the proper medical treatment. *Bates v. Meyer,* 565 So. 2d 134, 136 (Ala. 1990). Although an exception exists when the breach of the standard of care is obvious to the average layperson, *Ellingwood v. Stevens,* 564 So. 2d 932 (Ala. 1990); *Bell v. Hart,* 516 So. 2d 562 (Ala. 1987), . . . this exception [is not] applicable in the present case.[13] Where this exception is inapplicable, the expert witness must establish "1) the appropriate standard of care, 2) the doctor's deviation from that standard, and 3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff." *Bradford v. McGee,* 534 So. 2d 1076, 1079 (Ala. 1988) (citations omitted).

The failure of an expert to establish the standard of care results in a lack of proof essential to a medical malpractice plaintiff's case. *Rosemont, Inc. v. Marshall,* 481 So. 2d 1126 (Ala. 1985). In order to establish the standard of care in this case, [plaintiff] was required to enumerate the prevailing medical procedures in the national medical community that reasonably competent physicians would ordinarily utilize when acting in the same or similar circumstances. *Bates v. Meyer,* 565 So. 2d 134, 136 (Ala.1990). If the

---

[13]"[The Alabama Supreme Court] has held that testimony defining the standard of care owed by a physician, or a breach thereof, must be provided by an expert medical witness, unless the breach is so apparent as to be within the comprehension of the average layman. *Timmerman v. Fitts,* 514 So. 2d 907 (Ala. 1987); *Dobbs v. Smith,* 514 So. 2d 871 (Ala. 1987). Standard of care testimony is testimony concerning the degree of competency required of a professional, and it usually addresses whether the defendant in a particular case breached that standard. See S. Pegalis and H. Wachsman, *American Law of Medical Malpractice* § 11.4 (1981)." *Ellingwood v. Stevens*, 564 So. 2d 932, 934 (Ala. 1990).

The court finds that whether the applicable standard of care required Dr. Smith to order an MRI during Gifford's first ER visit on June 24, 2012, is not obvious to the average layman. Therefore, expert testimony is required to rebut defendants' expert testimony that an MRI was not medically necessary under the circumstances and that failing to order an MRI at that time was not a breach of the appropriate standard of care.

standard of care is not established, there is no measure by which the defendant's conduct can be gauged. *Dobbs v. Smith,* 514 So. 2d 871 (Ala. 1987).

*Pruitt v. Zeiger*, 590 So. 2d 236, 237-38 (Ala. 1991)(footnote added).

As noted above, defendants have submitted expert opinion testimony that the failure to order an MRI in the emergency room the day following Gifford's injury did not violate the appropriate standard of care. Specifically, this evidence establishes that Gifford's lack of neurologic symptoms, such as numbness or tingling, together with his description of the cause of his injury, swinging a baseball bat, indicated that he had a muscle strain or sprain. Dr. Smith testified that the need for an MRI was not indicated. (Doc. 24-1 ¶ 7.) Dr. Holbrook testified that Dr. Smith's diagnosis was consistent with Gifford's reported injury, (doc. 60-3 ¶ 6), and that the need for an MRI was not "emergent" until Gifford reported symptoms of incontinence, (*id*. ¶¶ 17, 35). Moreover, Dr. Hall, the BOP orthopedic surgeon, testified Gifford's treatment would not have been different even if he had been diagnosed with a torn disk by MRI on June 24, 2012, because "in the absence of significant neurologic deficits(s), he should have continued with non-operative treatment." (Doc. 60-11 ¶ 3.) This evidence establishes that Dr. Smith's conduct in failing to order an MRI on June 24, 2012, did not violate the standard of care.

Gifford did not respond to defendants' Special Reports, which the court has treated as motions for summary judgment. As a result, he has not supported his claim under the

AMLA with expert testimony establishing the standard of care or that Dr. Smith's actions or inactions breached that standard.

Therefore, his claim against Dr. Smith will be dismissed.

## B. FEDERAL TORT CLAIMS ACT

Gifford alleges claims under the Federal Tort Claims Act against the United States based on its alleged "intentional[ ] depriv[ation] [of] a medically necessary MRI," (doc. 11 ¶ 75), "fail[ure] to provide medically necessary treatment for [his] serious back injury," (*id.* ¶ 81), and "knowing[ ] and willful[ ] falsifi[cation] [of his] Bureau Electronic Medical Records," (*id.* ¶ 85). For the reasons set forth below these claims are due to be dismissed.

### 1. Falsified Medical Records

Gifford alleges that the United States falsified his medical records in an attempt to mislead "the finder of fact" as to the true nature of his back injury, which constitutes "governmental fraud and abuse." (Doc. 11 ¶¶ 84-85.) Gifford did not exhaust this claim by including it in his Administrative Claim. (*See* doc. 60-14 at 2; *see also id.* at 4.) Therefore, this claim is due to be dismissed.

> The FTCA provides a limited waiver of the United States' sovereign immunity for tort claims. *Suarez v. United States,* 22 F.3d 1064, 1065 (11th Cir. 1994). "It allows the government to be sued by certain parties under certain circumstances . . . ." *Id.* However, "[a] federal court may not exercise jurisdiction over a suit under the FTCA unless the claimant first files an administrative claim with the appropriate agency." *Id.* (citing 28 U.S.C. §2675(a)). The administrative claim must be filed within two years from the time the claim accrues and must be "accompanied by a claim for money damages in a sum certain." 28 C.F.R. § 14.2(a); 28 U.S.C. §§ 2675, 2401(b).

*Dalrymple v. United States*, 460 F.3d 1318, 1324 (11th Cir. 2006); *see Douglas v. United States*, 814 F.3d 1268, 1279 (11th Cir. 2016)("Before filing an FTCA lawsuit, a plaintiff must fully exhaust administrative remedies for his claims. The BOP has promulgated regulations describing how prisoners should file administrative FTCA claims against the BOP. Prisoners may file suit only after the final agency action.")(citations omitted). "Courts of this Circuit have construed this mandate to mean that a plaintiff must provide written notice to the agency that includes (1) sufficient information to enable the agency to investigate the claim, and (2) a sum certain for the amount of damages sought." *Dixon v. United States*, 96 F. Supp. 3d 1364, 1368-69 (S.D. Ga. 2015)(citing *Adams v. United States*, 615 F.2d 284, 289 (5th Cir. 1980)); *see also Orlando Helicopter Airways v. United States*, 75 F.3d 622, 625 (11th Cir. 1996). "[N]otice must be satisfied with respect to *each* legal claim." *Dixon*, 96 F. Supp. 3d at 1369 (citing *Turner ex rel. Turner v. United States*, 514 F.3d 1194, 1200 (11th Cir. 2008))(emphasis in original); *see also Dalrymple*, 460 F.3d at 1325 (11th Cir. 2006)("The FTCA requires that *each* claim and *each* claimant meet the prerequisites for maintaining a suit against the government.")(emphasis in original). However, the notice need not recite every possible legal theory; "[r]ather, section 2675(a) requires that the claimant's notice provide sufficient information to enable the government to investigate the tort claim." *Orlando Helicopter Airways*, 75 F.3d at 625(citing *Tidd v. United States*, 786 F.2d 1565, 1568 (11th Cir. 1986); *Bush v. United States*, 703 F.2d 491, 495 (11th Cir. 1983)).

Nothing in Gifford's administrative claim notified the BOP of his claim that he had been injured by individuals falsifying his medical records. *See Torjabo v. United States*, No. 6:05-cv-419-Orl-28KRS, 2007 WL 1970867, *4 (M.D. Fla. July 3, 2007). Certainly his administrative claim did not "provide sufficient information" to suggest that the agency should investigate falsified medical records in addition to Gifford's claims based on inadequate medical treatment. Therefore, the court finds that Gifford did not exhaust his administrative remedy with regard to his FTCA claim alleging falsified medical records, and the court will dismiss that claim without prejudice based on a lack of jurisdiction.

In the alternative, the court notes that this claim is barred by § 2680(h) of the FTCA. The FTCA does not apply to "[a]ny claim arising out . . . misrepresentation [or] deceit." 28 U.S.C. § 2680(h). If the court has jurisdiction over this claim, the claim would be dismissed with prejudice as barred by § 2680(h). However, because the court lacks jurisdiction, this claim will be dismissed without prejudice.

### 2. Medical Malpractice

Two of Gifford's claims under the FTCA are based on alleged medical malpractice and/or inadequate medical treatment. (*See* doc. 11 ¶ 75 ["intentional[ ] depriv[ation] [of] a medically necessary MRI"]; *id*. ¶ 81 ["fail[ure] to provide medically necessary treatment for [his] serious back injury"].) "To prevail under the FTCA, [Gifford must] satisfy the requirements of Alabama medical malpractice law. *Moore v. Guzman*, 362 Fed. Appx. 50,

53 (11th Cir. 2010)(citing 28 U.S.C. § 1346(b)(1);[14] *FDIC v. Meyer*, 510 U.S. 471, 478

(1994)). As set forth above –

> . . . a defendant cannot be held liable for medical malpractice in Alabama
> unless she fails "to exercise such reasonable care, diligence and skill as
> physicians, surgeons, and dentists in the same general neighborhood, and in
> the same general line of practice, ordinarily have and exercise in a like case."
> Ala. Code. § 6-5-484(a). Unless the applicable standard of care would be
> obvious to a layperson, Alabama plaintiffs must "establish the defendant
> physician's negligence through expert testimony as to the standard of care and
> the proper medical treatment." *Pruitt v. Zeiger*, 590 So. 2d 236, 237-38 (Ala.
> 1991). [Gifford] produced neither expert testimony nor a learned treatise, *see*
> *McMickens v. Callahan*, 533 So. 2d 579, 581 (Ala. 1988), in opposition to the
> defendants' summary judgment motion. Because this failure "results in a lack
> of proof essential to a medical malpractice plaintiff's case" under Alabama
> law, *Pruitt*, 590 So. 2d at 238, . . . summary judgment on [Gifford's] FTCA
> claims [based on medical malpractice is due to be granted].

*Moore*, 362 Fed. Appx. at 54 (footnote omitted).

The court finds expert testimony is required to show (1) the standard of care

applicable to the medical service providers and (2) the medical service providers' breach or

breaches of that standard of care. Gifford failed to present expert testimony; therefore, his

FTCA claims based on medical malpractice will be dismissed.

As set forth above, the government has presented expert testimony that Gifford's

medical treatment did not breach the appropriate standards of care of treatment for a back

injury. Not only has Gifford failed to offer any expert testimony to support his claim, he has

---

[14]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be
unpublished unless a majority of the panel decides to publish it. ***Unpublished opinions are
not considered binding precedent, but they may be cited as persuasive authority***." 11th Cir.
R. 36-2 (emphasis added).

also failed to offer expert testimony to rebut the government's experts that the medical staff at Talladega did not breach any standard of care and that they appropriately treated Gifford's complaints and symptoms, including evaluations and testing. In light of the government's showing, the onus was upon Gifford to come forward with expert medical evidence sufficient to create a genuine issue of material fact with respect to the elements of an AMLA claim. Having failed to do so, his FTCA claims based on medical malpractice will be dismissed with prejudice.

## C. *BIVENS* CLAIMS

In his Amended Complaint Gifford alleges a number of causes of actions based on *Bivens*.[15] "In *Bivens* – proceeding on the theory that a right suggests a remedy – [the Supreme] Court 'recognized . . . an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (quoting *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 66 (2001)). "[W]here *Bivens* . . . appl[ies], the implied cause of action is the 'federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983.'" *Iqbal*, 556 U.S. at 675 (citations omitted). Like § 1983, "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." *Id*. at 676 (citations omitted). Also, a *Bivens* cause of action is not available against a federal

---

[15]*Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

agency, *F.D.I.C. v. Meyer*, 510 U.S. 471, 486 (1994), or private entities acting under color of federal law, *Malesko*, 534 U.S. at 66.

### 1. Institutional Defendants

#### a. The Hospital

Gifford alleges, "Defendants Northeast Regional Medical Center, and the Federal Bureau of Prisons did knowingly enter into a medical service contract[16] that was reasonably foreseeable to violate Plaintiff's constitutional rights to be free from cruel and unusual punishment and protect Plaintiff from the infliction of pain and suffering pursuant to 42 U.S.C. § 1983 [and] *Bivens v. Six Unknown Federal Agents*." (Doc. 11 at 8 [footnote added].) However, no *Bivens* claim against the Hospital "exists because the Supreme Court has held that no *Bivens* action lies against a private entity alleged to act unconstitutionally under color of federal law." *Sabeta v. Baptist Hosp. of Miami, Inc.*, 410 F. Supp. 2d 1224, 1245 (S.D. Fla. 2005)(citing *Malesko*, 534 U.S. at 69-70).

Therefore, Gifford's *Bivens* claim against the Hospital will be dismissed with prejudice.

---

[16]As set forth in the Statement of Facts, the Hospital did not have a medical-services contract with the BOP, although these entities had agreed to a pricing schedule. See, *supra*, p. 8. As Dr. Holbrook testified, and Gifford has not disputed, "Neither [Dr. Holbrook] nor FCI Talladega had any input on what tests should be ordered for any inmate in the care of the hospital or any outside medical entity." (Doc. 60-3 ¶ 34.)

Also, no claim pursuant to § 1983 exists against the Hospital. "A claim upon which relief may be granted to [Gifford] against [the Hospital] under § 1983 must embody at least two elements." *Flagg Bros. v. Brooks*, 436 U.S. 149, 155 (1978).

> [Gifford is] first bound to show that [he has] been deprived of a right "secured by the Constitution and the laws" of the United States. [42 U.S.C. § 1983.] [He] must secondly show that [the Hospital] deprived [him] of this right acting "under color of any statute" of the State of [Alabama]. It is clear that these two elements denote two separate areas of inquiry.

*Id.* at 155-56 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970)). Therefore, the Supreme Court, interpreting § 1983, has "insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the ***State***." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)(emphasis added). Gifford has presented no evidence upon which a reasonable jury could find that the acts of the Hospital are attributable to the State of Alabama.

Therefore, to the extent Gifford's Amended Complaint alleges a § 1983 claim against the Hospital, such claim will be dismissed with prejudice.

Based on the foregoing, the court finds that Gifford's claims against the Hospital – whether under § 1983 or *Bivens* – are due to be dismissed.

### b. Bureau of Prisons and Utilization Review Board

The law is clear that *Bivens* does not provide a remedy for alleged constitutional deprivation directly against a federal agency. *F.D.I.C. v. Meyer*, 510 U.S. 471, 486 (1994), *cited in Walden v. Centers for Disease Control & Prevention*, 669 F.3d 1277, 1283 (11th

Cir. 2012).  Indeed, "*Bivens* from its inception has been based not on [the deterrence of the unconstitutional acts of the policy-making entity], but on the deterrence of individual officers who commit unconstitutional acts."  *Malesko*, 534 U.S. at 71.

> If a federal prisoner in a BOP facility alleges a constitutional deprivation, he may bring a *Bivens* claim against the offending individual officer, subject to the defense of qualified immunity.  The prisoner may not bring a *Bivens* claim against the officer's employer, the United States, or the BOP.  With respect to the alleged constitutional deprivation, his ***only*** remedy lies against the individual . . . .

*Id.* at 71-72 (emphasis added).

Therefore, the court finds that Gifford cannot state a *Bivens* claim against the Utilization Committee and/or BOP.  His *Bivens* claims against these entities will be dismissed.

### 2.  Individual Defendants

#### a.  Warden John Rathman

Gifford contends that defendant John Rathman, then Warden of FCI Talladega, was deliberately indifferent to his medical needs by refusing to provide him a timely MRI.  (Doc. 11 ¶ 55.)  However, according to the medical records, Rathman was never directly involved in any medical decision regarding whether to provide Gifford an MRI.  Indeed, whether or not to order an MRI was made by Dr. Smith in the ER and FCI-Talladega's medical service providers.  (Doc. 60-3 ¶¶ 14, 17, 34.)  Therefore, Gifford's claim, that Rathman was deliberately indifferent to his medical need by denying him an MRI, will be dismissed.

To the extent that Gifford alleges Rathman is vicariously liable, such claim is also due to be dismissed. "[I]ndividual government officials cannot be held liable in a *Bivens* suit unless they themselves acted unconstitutionally." *Wood v. Moss*, 134 S. Ct. 2056, 2070 (2014)(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009)). "*Bivens* is not designed to hold officers responsible for acts of their subordinates." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1860 (2017)(citing *Iqbal,* 556 U.S. at 676)(emphasis omitted).

> "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Florida Dep't of Labor & Employment Sec.,* 133 F.3d 797, 802 (11th Cir. 1998). Supervisors "can be held liable under [*Bivens*] when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiffs, and his conduct was causally related to the constitutional violation committed by his subordinate." *Greason v. Kemp,* 891 F.2d 829, 836 (11th Cir. 1990)(citations and footnote omitted).

> "Supervisory liability [under *Bivens*] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Braddy,* 133 F.3d at 802 (quoting *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir. 1990)). A causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," *id.,* or when the supervisor's improper "custom or policy . . . resulted in deliberate indifference to constitutional rights," *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir. 1991). A causal connection can also be established by facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. *See Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1561 (11th Cir. 1993)(finding no supervisory liability in the absence of such an inference).

*Gonzalez v. Reno*, 325 F.3d 1228, 1234-35 (11th Cir. 2003); *see also Rice v. Sixteen Unknown Fed. Agents*, 658 Fed. Appx. 959, 961 (11th Cir. 2016)("To demonstrate a causal connection, a plaintiff must show either that (1) the supervisor was put on notice, by a history of widespread abuse, of the need to correct the alleged deprivation, but failed to do so; (2) the supervisor's policy or custom resulted in deliberate indifference; (3) the supervisor directed subordinates to act unlawfully; or (4) the supervisor knew that subordinates would act unlawfully and failed to intervene.")(citing *Gonzalez*, 325 F.3d at 1234).

Gifford has not presented evidence sufficient to show a disputed issue of fact as to Rathman's direct involvement in the decision to provide him (or not provide him) with an MRI. Therefore, the court finds that his *Bivens* claim against Rathman is due to be dismissed.

### b. Medical Services Providers – Deliberate Indifference to a Serious Medical Need

Gifford alleges that defendants Holbrook, Mourtada, Marasigan, Paco, and Tipple were deliberately indifferent to his serious medical needs. (Doc. 11 ¶¶ 60-64.) He alleges that Dr. Holbrook was deliberately indifferent to his serious medical condition by treating him conservatively until sending him to the ER on or about August 6, 2012. Also, he alleges that, "even though the defendant[s] never 'refused to treat' [him]," the defendants provided "substandard care" and were inattentive to his serious medical needs in the following ways:

1. Denied him pain medication prescribed by the Hospital's ER;

2.  Denied him effective pain medication;

3.  Lied to him about the BOP's ability to provide him narcotic pain medication;

4.  Denied him a lower bunk pass during the first three weeks of [his] injury;

5.  Demanded he walk the track and use hot packs, which aggravated his condition;

6. Refused to provide him a shower stool;

7.  Refused to provide him adult diapers;

8.  Lied about doing the paperwork for an MRI; and

9.  Dr. Holbrook voted to deny him an MRI.

(*Id.*)

The law regarding deliberate indifference to a prisoner's medical care and treatment

is well settled:

> ***Medical treatment violates the Eighth Amendment "only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness*.'"** *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)(citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Incidents of mere negligence or malpractice do not rise to the level of constitutional violations. *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976)). Similarly, a difference in medical opinion between the medical staff and an inmate as to the inmate's diagnosis or course of medical treatment does not support a claim of cruel and unusual punishment. *Id.* (citations omitted). Stating an Eighth Amendment claim of denial of adequate medical care requires satisfying both an objective and subjective component. *Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir. 2000), *cert. denied* 531 U.S. 1077, 121 S. Ct. 774, 148 L. Ed. 2d 673 (2001). ***First, there must be conduct by prison officials which, objectively speaking, is "sufficiently serious" to constitute a deprivation "'denying the minimal***

*civilized measure of life's necessities.'" Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324, 115 L. Ed. 2d 271 (1991)(internal quotation omitted)). **Second, the prison officials must possess a subjective intent to use the medical deprivation as a means of punishment.** *Id.* (citations omitted).

Both the objective and subjective components encompass two subsidiary requirements. *Id.* at 1258. **As to the objective prong, an objectively serious deprivation requires a showing of an objectively "serious medical need."** *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1186 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); *see Farmer* [*v. Brennan*], 511 U.S. [825,] 834, 114 S. Ct. [1970,] 1977 [(1994)](serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm."). **In addition, an objectively serious deprivation requires a showing that the response made by Defendants to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain."** *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 291-92 (internal quotation marks omitted); *see Taylor*, 221 F.3d at 1257; *see also Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995).

To show the required subjective intent to punish, Plaintiff must demonstrate that Defendants acted with an attitude of "deliberate indifference." *Estelle,* 429 U.S. at 105, 97 S. Ct. at 291. "Deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Farrow v. West,* 320 F.3d 1235, 1245-46 (11th Cir. 2003)(citing *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999); *Taylor,* 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need")). "Deliberate indifference" and "mere negligence" are not one and the same. **Deliberate indifference must be more than a medical judgment call or an accidental or inadvertent failure**

> ***to provide adequate medical care.*** Murrell v. Bennett, 615 F.2d 306, 310 n.4 (5th Cir.1980).[17]
>
> A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference. *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994). ***However, where the inmate has received medical treatment, and the dispute is over the adequacy of that treatment, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made.*** *Harris v. Thigpen*, 941 F.2d at 1507 (quoting *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir. 1989)). To do otherwise would be "to constitutionalize claims that sound in tort law." *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985)(quotation omitted).

*Hervy v. McDonough*, No. 5:07cv58/RS/EMT, 2007 WL 1482392, *3-4 (N.D. Fla. May 18, 2007)(emphasis and footnote added); *see also Harris v. Prison Health Services*, No. 15-13791, 2017 WL 3616341, at *5 (11th Cir. Aug. 23, 2017)(unpublished); *Patrick v. Ala. Dep't of Corr.*, No. 2:17-CV-132-MHT, 2017 WL 2644260, *4-6 (May 8, 2017), *report and recommendation adopted* 2017 WL 2644254 (M.D. Ala. June 19, 2017). "Medical treatment [or lack thereof] that is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness violates the eighth amendment." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)(internal citations omitted). "[T]herefore, '[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment,' and is, at most, 'medical malpractice.'" *Harris*, 2017 WL 36163431, at *7 (quoting *Estelle*, 429 U.S. at 107).

---

[17]Decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

### i. Denial of specific narcotic pain medicine prescribed by ER doctor

Gifford alleges that Dr. Smith prescribed "heavy narcotic medicine," Percocet, for his back strain/sprain and that "FBOP staff refused to provide that medicine and substituted it with only one [Tylenol] #3, twice per day, for a three day period." (Doc. 11 ¶¶ 25-26.) He contends that the substituted pain medication "never relieved the pain." (Doc. 1-1 ¶ 19.) According to defendants Dr. Holbrook and Marasigan, Percocet and Robaxin, the medications prescribed by Dr. Smith in the ER, were "non-formulary," not available in the pharmacy,[18] and Tylenol with codeine was substituted for Percocet. (Doc. 60-3 ¶ 7; doc. 60-7 ¶ 5.) Dr. Holbrook testified that, in his medical opinion, Tylenol with codeine was "appropriately substituted" for Percocet. (Doc. 60-3 ¶ 7.)

Gifford has presented no evidence to rebut Dr. Holbrook's medical opinion that Tylenol with codeine was an adequate substitute for Percocet. "With no evidence that such a substitution was unreasonable, [the court] cannot find that the Defendants' actions amounted to a failure to take reasonable measures to abate [plaintiff's] pain." *See Burton v. Owens*, 511 Fed. Appx. 385, 389-90 (5th Cir. 2013); *see also DeBoer v. Luy*, 70 Fed.

---

[18]"[BOP] maintains a formulary of drugs that its physicians are permitted to prescribe without further ado." *United States v. Rothbard*, 851 F.3d 699, 701 (7th Cir. 2017). "The primary goals of BOP Formulary Management are to optimize therapeutic outcomes, optimize cost effectiveness of medications, and to ensure drug usage is conducive within the correctional environment." *Federal Bureau of Prisons Health Services National Formulary*, *Part I*, at 6 (2016) [hereinafter "FBOP Formulary"], available at https://www.bop.gov/resources/pdfs/formulary.pdf. "That does not mean, however, that non-formulary drugs are impossible to obtain. To the contrary, if a doctor believes that a patient needs a non-formulary drug, the doctor may prescribe it by following certain procedures." *Rothbard*, 851 F.3d at 701; *see* (7th Cir. 2017); FBOP Formulary at 6-7.

Appx. 880, 883 (7th Cir. 2003)(physician defendant was not deliberately indifferent by substituting Tylenol #3 for prescribed Vicodin; substitution decision was reasonable based on physician's medical judgment).

The court finds that Gifford has not shown a question of fact exists as to whether Marasigan and Dr. Holbrook were deliberately indifferent to his pain by substituting Tylenol with codeine for the pain medication prescribed in the ER. Therefore, this claim will be dismissed.

### ii. Denial of effective pain medication for six weeks

Gifford alleges that defendants denied him effective pain medicine for six weeks, (doc. 11 ¶ 61), presumably June 24, 2012, the date he was first seen in the ER, until August 6, 2012, the date he returned to the ER. Gifford has not presented evidence to rebut defendants' showing that they provided him appropriate medications based on his complaints, their examinations and evaluations, and the diagnosis of a back sprain or strain. Gifford may have believed he should receive more and stronger medications for his pain, but a difference of opinion between the prisoner patient and the medical-service providers regarding the type and dosage of medication does not demonstrate deliberate indifference to the prisoner patient's pain. Certainly this difference of opinion does not support an inference that defendants acted with subjective intent to punish or that defendants' medication decisions were so deficient as to constitute the unnecessary and wanton infliction of pain. *See Estelle*, 429 U.S. at 105-06.

Defendants have presented evidence that Gifford was treated according to their reasonable medical judgment and in good faith. (*See* doc. 60-3 ¶¶ 7, 35-36; doc. 60-7 ¶10; doc. 60-10 ¶¶ 6-7; doc. 60-12 ¶¶ 7-8; 60-8 ¶¶ 8-9.) Gifford has not shown otherwise. Therefore, this claim will be denied.

### iii. Lie about ability to provide narcotic pain medicine

Gifford alleges that the "staff [lied] about the ability for the FBOP to provide [the prescribed] narcotic pain medicines." (Doc. 11 ¶ 61.) The court notes that nothing in the record demonstrates that anyone lied to Gifford regarding the ***availability*** of Percocet. Marasigan told Gifford that Percocet was not in the Health Services's pharmacy and Gifford has not pointed to any evidence that Percocet was actually available on site. Nevertheless, although, under certain circumstances, the ***denial*** of a particular medication may be deliberate indifference to a serious medical need, simply ***lying*** about the availability of a particular medication will not. As set forth above, the evidence presented shows that Tylenol with codeine was a medically appropriate medication for Gifford's pain. Therefore, he has not shown that giving him Tylenol with codeine, instead of Percocet, was such an inadequate response to his medical needs as to constitute the unnecessary and wanton infliction of pain. *See Estelle*, 429 U.S. at 105-06.

Therefore, Gifford's claim based on defendants' alleged lie about the availability of Percocet will be dismissed.

### iv. Failure to give him a lower-bunk pass for three weeks after his injury

Gifford alleges that defendants were deliberately indifferent to his serious medical needs by failing to provide him with a lower-bunk pass until three weeks after he injured his back. (Doc. 11 ¶ 61.) He also alleges that defendants Bott and Hardin harassed him by denying him a lower bunk pass for weeks. (*Id*. ¶ 72.) In support of their Special Report, defendants have submitted evidence that Gifford was issued a lower-bunk pass and a single-cell pass on June 26, 2012, and, when Gifford presented the low bunk pass to Hardin, Hardin reassigned a low bunk that day. (*See* doc. 60-9 at 2.) Gifford did not respond to defendant's Special Report; therefore, the court finds this evidence is undisputed.

The court finds no evidence of deliberate indifference based on the short delay before Gifford received a lower-bunk pass. Thus, this claim will be dismissed.

### v. Gifford required to "walk the track and use hot packs"

Gifford alleges that defendants were deliberately indifferent to his serious medical needs by "demanding that Plaintiff 'walk the track and use hot packs' which only placed more pressure on the fecal sac causing loss of bowels."[19] (Doc. 11 ¶ 61.) However, he has presented no medical opinion evidence that walking the track and using hot packs caused him to develop CES or worsened his herniated disk, or that treating a back strain or sprain with heat and exercise was such a deficient response to the medical need as to constitute unnecessary and wanton infliction of pain. Also he has failed to demonstrate any facts that

---

[19]The medical record contains no indication that Gifford complained about losing control of his bowels to anyone in Health Services.

would support a finding that defendants demanded he exercise and use hot packs with the intent to punish him.

The court finds that Gifford's Eighth Amendment claim based on defendants' treatment of his back pain with exercise and heat is due to be dismissed.

### vi. Shower stool

Gifford alleges that defendants were deliberately indifferent to his serious medical needs when they "refus[ed] to provide [him] with a small stool/bench to shower with." (Doc. 11 ¶ 61.) The record contains no evidence that any defendant denied Gifford a shower stool, or that Gifford ever requested a shower stool. Without evidence of the intentional refusal to provide a shower stool for the purpose of punishing Gifford, there can be no showing of deliberate indifference. *See Estelle*, 49 U.S. 105.

Therefore, Gifford's Eighth Amendment claim based on defendants' failure to provide him a shower stool will be dismissed.

### vii. Adult diapers

Gifford alleges that defendants "refus[ed] to provide [him] adult diapers upon being notified [of his symptoms of] fecal leakage and bladder incontinence." (Doc. 11 ¶ 61.) The evidence is undisputed that, at the time Gifford first notified any of the defendants that he had experienced incontinence, he was sent forthwith to the ER, and he did not return to Talladega until months later. Because of the almost simultaneous transfer to the ER after complaining of incontinence, defendants had no opportunity to deny Gifford adult diapers.

48

Therefore, Gifford's claim that his Eighth Amendment rights were violated by defendants' refusal to provide him adult diapers after he notified them of his incontinence will be dismissed.

### viii.  Lie regarding paperwork for an MRI

Gifford alleges that his Eighth Amendment rights were violated when defendants lied "about 'doing the paperwork for an MRI' early on during the post-injury period of time." (Doc. 11 ¶ 61.)  Defendants deny that they lied to Gifford.  Nevertheless, any lie about whether or not defendants had prepared paperwork for Gifford to receive an MRI does not constitute deliberate indifference to Gifford's serious medical needs.  Gifford has not shown that failure to send him for an MRI shortly after he injured his back violated his Eighth Amendment rights.  Therefore, lying about doing paperwork for the MRI at that time did not constitute deliberate indifference.

Gifford's claim based on a lie about MRI paperwork will be dismissed.

### ix.  Ultra-conservative treatment protocols

Gifford alleges, "Plaintiff will bring proof to a jury that Defendant Dr. Holbrook was personally aware, apprised and repeatedly denied Plaintiff reasonable and appropriate medical attention that was non-effective and that Dr. Holbrook['s] decision to use ultra-conservative treatment protocols was grossly negligent . . . ."  Defendants have presented expert testimony that conservative treatment was medically reasonable given the stated cause of Gifford's back injury (swinging a bat), the diagnosis (lower back strain or

49

sprain), and the lack of neurologic and/or bladder symptoms after the injury. The court also notes that a relatively short amount of time passed between the initial injury, June 23, 2012, and his corrective surgery, August 8, 2012, during which defendants provided Gifford with medically reasonable care and treatment.

Gifford has failed to rebut defendants' evidence that his treatment was reasonable under the circumstances and that they did not act with the intent to cause him pain. "Medical treatment violates the eighth amendment *only* when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)(quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986))(emphasis added). Indeed, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995)(quoting *Estelle*, 429 U.S. at 107).

In this case, Gifford has not presented evidence that his treatment during the six weeks between his injury and his surgery was "grossly inadequate amounting to no treatment at all." *See McElligott v. Foley*, 1882 F.3d 1248, 1259 (11th Cir. 1999). Therefore, this claim based on his conservative treatment will be dismissed.

.        **c. Wanton Infliction of Pain**

In his Amended Complaint, Gifford alleges that defendants Dr. Holbrook, Paco, and Williams wantonly caused him pain when they moved him from his wheel chair to the examination table on July 29, 2012.[20] He alleges:

> [D]efendants acted jointly, severably and/or in concert to subject [him] to a terrifying medical experience when MLP Paco directed C/O Williams to get [Gifford] out of the wheelchair and put [him] on an examination table, to which C/O Williams placed [Gifford] in a bear hug, hefted him out of a wheelchair and plopped [him] on the exam table, causing immediate [excruciating] pain, agony, back spasms and [substantial] nerve pain, when any layman knows that grabbing [Gifford] with two arms and yanking [him] out of a wheelchair would intentionally cause additional trauma to the large ruptured disc injury.

(Doc. 11 ¶ 67.) He also alleges intentional or wanton infliction of pain because Dr. Holbrook and Paco decided not to send him to the ER because it was Paco's early night and wanted to go home. (*Id.* ¶ 68.)

### i. Bear Hug

The Supreme Court has held that "only the ***unnecessary*** and ***wanton*** infliction of pain implicates the Eighth Amendment. [Therefore,] [t]o violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)(internal citations and quotations omitted; emphasis added). Some factors to consider "evaluating whether the force used was excessive and in violation of the Eighth Amendment" include:

---

[20]Gifford's Amended Complaint alleges that this incident occurred on ***August*** 29, 2012. (Doc. 11 at 13.) However, on August 29, 2012, Gifford was no longer at FCI-Talladega. Moreover, the medical records indicate that Paco examined Gifford on July 29, 2012. (*See* doc. 54-1 at 58.)

(1) the extent of the injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them; and (5) any efforts to temper the severity of a forceful response.

*Gwathney v. Warren*, 930 F. Supp. 2d 1313, 1319 (M.D. Ala. 2013)(quoting *Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999)(quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986))). The "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline [or in this case – to provide medical services], or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury." *Gwathney*, 930 F. Supp. 2d at 1319 (quoting *Campbell*, 169 F.3d at 1375 (quoting *Whitley*, 475 U.S. at 322)).

The fact that Gifford suffered pain when he was removed from the wheelchair is not disputed. However, such fact alone does not suggest that such pain was unnecessary or applied maliciously or sadistically. Although subsequent events established that Gifford had a herniated disk and developed CES, on July 29, 2012, he had been diagnosed with a strain or sprain of his lower back. He was seen in Health Services on July 27 and 28, 2012. Paco's evaluation on July 29 was consistent with the diagnosis of a strain or sprain and his evaluation was consistent with other MLPs' evaluations before and after Paco's evaluation. Moreover, Gifford has not suggested, and the court does not find, that some other manner

of removing him from the wheelchair for purposes of providing medical treatment was available. Certainly Gifford has not presented evidence that the bear hug was used with the intention to cause him pain.[21]

The court finds causing pain under these circumstances does not support a reasonable inference that defendants' intent was to inflict unnecessary pain maliciously or sadistically or that the force used was excessive under the circumstances. Defendants deny such was their intent and Gifford has not rebutted this evidence with direct or circumstantial evidence.

The court finds Gifford's claims based on the bear hug will be dismissed.

### ii. Paco's Early Night

Gifford alleges that Paco, with Dr. Holbrook's support, refused to help him on July 29, 2012, because, as Paco told Gifford, "this is my early night." (Doc. 11 ¶ 68.) Although this claim is set forth in the Amended Complaint as an excessive force/wanton infliction of pain claim, it sounds as a deliberate indifference claim based on Dr. Holbrook's and Paco's decision not to send Gifford to the ER on July 29, 2012. The court notes that Gifford does not claim deliberate indifference based on the decisions of Dr. Holbrook and other MLPs that examined Gifford on July 27, 28, and 30, 2012, not to send him to the ER on those days. As set forth above,

> In order to prove a claim of deliberate indifference, the plaintiff must
> show: (1) he had a serious medical need (the objective component); (2) the

_____

[21]Moving Gifford from the wheel chair to the examination table with the so-called bear hug, so that he did not twist and he was not required to stand or walk, appears to be most humane and careful way to move him to the examination table.

prison official acted with deliberate indifference to that serious medical need (the subjective component); and (3) the official's wrongful conduct caused the injury. *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007). To satisfy the subjective component, the plaintiff must prove the prison official subjectively knew of a risk of serious harm, the official disregarded that risk, and the official's conduct was more than gross negligence. *Id*. at 1326-27. Courts are competent to decide as a matter of law whether a plaintiff has met this "difficult burden." *West v. Tillman*, 496 F.3d 1321, 1327 (11th Cir. 2007) (internal quotation marks and emphasis omitted).

Deliberate indifference may be shown where there is "[g]rossly incompetent or inadequate care," *see Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989), the official refuses to provide medical care he knows is necessary, *see Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985), or ***the official delays in providing necessary diagnostic care or medical treatment for non-medical reasons***, *see H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir. 1986). *But see Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994)(noting a delay in providing treatment may be constitutionally tolerable, depending on the "nature of the medical need and the reason for the delay"). Mere inadvertence, negligence, or medical malpractice does not rise to the level of deliberate indifference, *Estelle*, 97 S. Ct. at 292, "[n]or does a simple difference in medical opinion," *Waldrop*, 871 F.2d at 1033.

*Fischer v. Fed. Bureau of Prisons*, 349 Fed. Appx. 372, 374 (11th Cir. 2009)(original emphasis deleted; emphasis added). Based on its review of the record, the court finds that Gifford's "***necessary*** diagnostic care or medical treatment" was not delayed for a non-medical reason.

According to the medical records, the result of Paco's evaluation of Gifford's symptoms was the same as the results of evaluations conducted on July 27 and 28, 2012. The medical testimony is that emergent care was not necessary on July 28-30, 2012; Gifford's condition did not require emergency treatment until he reported he had been

incontinent. Because he did not report incontinence on July 29, 2012, his back pain was not considered to be an emergency requiring immediate, outside evaluation, testing, and treatment.

Also, it does not appear that sending Gifford to the ER would have lengthened Paco's shift such that the court could infer Paco refused to send Gifford to the ER *because* it was his early night. On Gifford's two other trips to the ER, he was not accompanied by an MLP; therefore, the court finds no evidence that Paco would have been required to accompany Gifford to the ER on July 29, 2012, or that sending him to the ER would have delayed Paco leaving work. As Paco's shift ended *before* he saw Gifford in Health Services, it seems most likely that his "early night" comment was an expression of his frustration at being delayed and not a statement of his intent to deny Gifford medical care. Indeed, nothing in the records support a finding that Gifford's treatment in Health Services was any different on July 29, 2012, than his treatment on the two days before or the day after his July 29, 2012, visit to Health Services.

Assuming Paco made a statement to Gifford that he would not help him because it was his early night, Gifford has not shown that his treatment by Paco was grossly incompetent or that Paco denied him necessary care and/or treatment. Therefore, this claim will be dismissed.

### d. Hostile Environment and Harassing Treatment

Gifford alleges that "defendants [Bott, Hardin, Gardner, Paco, and Mourtada] created a hostile, brutal and disparate atmosphere against Plaintiff due to his back injury." (Doc. 11 ¶ 71.) The alleged acts creating the "hostile, brutal, and disparate atmosphere" include:

> C/O Bott threatening to "kick the Plaintiff's ass"; Counselor Hardin threatening to make the Plaintiff push a lawn mower while injured;. . . [and] MLP Mourtada humiliating Plaintiff by telling him . . . that "grown men don't cry" . . . .

(*Id.*)[22]

The law is well-settled that "allegations of verbal abuse and threats by the prison officers [do] not state [an Eighth Amendment violation] claim because the defendants never carried out these threats and verbal abuse alone is insufficient to state a constitutional claim." *Hernandez v. Florida Dep't of Corr.*, 281 Fed. Appx. 862, 866 (11th Cir. 2008)(citing *Edwards v. Gilbert*, 867 F.2d 1271, 1271 n.1 (11th Cir. 1989)); *see also Mimms v. U.N.I.C.O.R.*, 386 Fed. Appx 32, 35 (3d Cir. 2010)("Verbal harassment of a prisoner, without more, does not violate the Eighth Amendment." (citing *McBride v. Deer*, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001); *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000))); *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987)("[I]t trivializes the eighth amendment to believe a [mere naked] threat constitutes a constitutional wrong. . . . We find no case that squarely holds a threat to do an act prohibited by the Constitution is equivalent to doing the

---

[22]Gifford also included Paco's failure to send him to the ER and BOP's failure to adequately train its officers as acts contributing to the hostile environment. For reasons set forth elsewhere in this Memorandum Opinion, these claims are not actionable pursuant to *Bivens*.

act itself."); *Carey v. Warden Rene Mason*, No. 2:13-CV-884-WHA, 2017 WL 526616, *10 (M.D. Ala. Jan. 3, 2017)("[T]he law is well-settled that derogatory, demeaning, profane, threatening or abusive comments made by correctional officials to an inmate, no matter how repugnant or [un]professional, do not rise to the level of a constitutional violation." (citing *Edwards v. Gilbert*, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989); *Ayala v. Terhune*, 195 Fed. Appx. 87, 92 (3d Cir. 2006); *McBride*, 240 F.3d at 1291 n.3; *Sims v. Hickok*, 185 F.3d 875 (10th Cir. 1999); *Ivey v. Wilson*, 832 F.2d 950, 954-955 (6th Cir. 1987); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987); *Gaul*, 810 F.2d at 925; *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979))), *report and recommendation adopted*, 2017 WL 527663 (M.D. Ala. Feb. 8, 2017); *Thomas v. Comm'r, Alabama Dep't of Corr.*, No. 1:15-CV-00199-CLS-TMP, 2016 WL 2962889, *6 (N.D. Ala. Jan. 26, 2016)("[W]here threats of violence do not result in physical contact or where threats are not carried out, a claim based upon such threats is due to be dismissed in a [*Bivens*] action, even where such threats are without apparent justification.") *report and recommendation adopted*, 2016 WL 2939629 (N.D. Ala. May 20, 2016).

Gifford does not allege that any threats were carried out and he does not allege that the verbal abuse resulted in, or was accompanied by, physical contact. Therefore his Eighth Amendment claim based on threats and verbal abuse will be dismissed.

Gifford also alleges that the atmosphere was hostile because "C/O Gardner never fil[ed a] complaint to her supervisor [about] C/O Bott . . . threatening [Gifford] and [she did]

not fil[e a] complaint to her supervisors about Plaintiff's serious injury." (Doc. 11 ¶ 71.)

"Failure to report the incident does not violate the Eighth Amendment absent facts showing that by failing to report the incident, [Gardner] knowingly disregarded an excessive risk to [Gifford's] health or safety." *Bullard v. St. Andra*, No. 1:17-CV-0328-MJS(PC), 2017 WL 1398834, *3 (E.D. Cal. Apr. 19, 2017). "And [in this Circuit], while officers who fail to intervene to protect a victim from another officer's unconstitutional act can be held liable under section 1983 [or *Bivens*], such occasions appear to be narrowly limited to those involving the use of excessive force." *Taratino v. Citrus County Government*, No. 5:12-CV-434-OC-32PRL, 2014 WL 4385550, 9 (M.D. Fla. Sept. 4, 2014). As Bott did not carry out his threat, the court finds Gardner had no special duty to report Bott's threat to kick Gifford's ass to her supervisor. Also, Gifford has alleged no injury and no risk to his health or safety resulted from Gardner's failure to report Bott's threat to her supervisor.

Moreover, the court finds no violation of Gifford's Eighth Amendment rights arising from Gardner's failure to report his injury to her supervisor. Gifford was seen by medical personnel and correctional officers on June 23 and 24, 2012, before being sent to the ER. His injury was documented in his medical records for June 23 and 24, 2012, and his trip to the ER by ambulance on June 24, 2012, was recorded in the Camp Log Book.

"Failure to report Plaintiff's injuries does not necessarily equate to deliberate indifference. Plaintiff's allegations do not show that any such failure by [Gardner] interfered with his ability to obtain medical care for his injuries so as to state a cognizable claim for

deliberate indifference to Plaintiff's serious medical needs." *Wilson v. Campbell*, No. 1:16-CV-00534-SKO(PC), 2017 WL 896316, *5 (E.D. Cal. Mar. 6, 2017); *see also Carrere v. May*, No. 16-CV-00591, 2016 WL 6684796, *3 (W.D. La. Sept. 9, 2016)("Plaintiff has not alleged facts sufficient to establish that Sgt. Curtis disregarded a serious medical need by simply failing to report a fall. Furthermore, per plaintiff's complaint, he was taken to the hospital 'immediately' following the fall. Accordingly, plaintiff's pleadings fall far short of alleging facts sufficient to establish deliberate indifference on the part of any of Sgt. Curtis and any claims against him should be dismissed.")(internal citation omitted), *report and recommendation adopted*, 2016 WL 6684247 (W.D. La. Nov. 14, 2016).

Gifford has failed to show any injury arising from Gardner's failure to report his injury to her supervisor or failure to report Bott's verbal threat. Therefore, this claim will be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendants are entitled to judgment as a matter of law. An Order granting defendants' Motions for Summary Judgment and dismissing plaintiff's claims will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 29th day of September, 2017.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE